MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2026 ME 40
Docket:       Cum-25-196
Argued:       January 8, 2026
Decided:      April 23, 2026

Panel:        STANFILL, C.J., and MEAD, CONNORS, LAWRENCE, DOUGLAS, JJ.

ROBERT J. HUTCHINSON

v.

ROSANNA PAOLA CORDOBA GOMEZ

MEAD, J.

[¶1] Rosanna Paola Cordoba Gomez appeals from a judgment of the District Court (Portland, *J. French, J.*) entered on Robert J. Hutchinson's complaint for divorce. Gomez contends that the court (1) erred in interpreting the parties' premarital agreement to establish waivers of any claim to Hutchinson's business ventures, increases in value to those business ventures, and equitable distribution; (2) erred in interpreting the provision of the premarital agreement detailing the future purchase of a condominium as not creating an enforceable claim because Hutchinson did not purchase the condominium; (3) erred in dismissing for lack of jurisdiction her claim for breach of contract regarding the condominium; and (4) abused its discretion in awarding her only approximately a quarter of her requested attorney fees.

2

Because we agree that the court erred in concluding that it lacked jurisdiction to consider the breach-of-contract claim regarding the condominium and in determining that the premarital agreement did not give rise to a claim given that Hutchinson did not purchase the condominium, we vacate the judgment.

## I. FACTS AND PROCEDURE

[¶2] We draw the procedural history from the record, *Doe v. McLean*, 2020 ME 40, ¶ 2, 228 A.3d 1080, and the facts from the trial court's factual findings, which are supported by competent evidence in the record, *Neri v. Heilig*, 2017 ME 146, ¶ 2, 166 A.3d 1020.

[¶3] On March 2, 2015, Hutchinson and Gomez, each represented by counsel, entered into a premarital agreement.[1] The premarital agreement specified that each party's separate property and estate would remain nonmarital property. *See* 19-A M.R.S. § 953(2)(D) (2025). The agreement also provided that the business interests of each party, whether then currently held or subsequently acquired, would be considered separate, nonmarital property. *See id.* Both parties waived their rights to equitable distribution of any property in which they may have gained an interest as a result of the marriage. *See id.*

---

[1] The exact language of the agreement is interwoven throughout this opinion when at issue. While this opinion refers to the parties by their surnames, the premarital agreement refers to them as Roby and Rosanna. "Roby" is not a party's first name. It is apparently a nickname for Robert.

§ 953(1). The agreement further discussed the expected future purchase of a condominium at Chandler's Wharf in Portland to be the marital home and provided that the value of the property would be divided equally between the parties in the event of a divorce.

[¶4] The parties were married on March 10, 2015. During the marriage, when the parties lived in Maine,[2] the parties resided in a home in Brunswick and in the condominium on Chandler's Wharf, both of which were owned by Hutchinson's mother, who died in 2021. Hutchinson never purchased the condominium from his mother, and the property is a part of Hutchinson's mother's probate estate.

[¶5] Throughout the marriage, Hutchinson engaged in a significant number of business ventures. Hutchinson refinanced a mortgage on one of his properties and received approximately seven million dollars. The court traced these funds and found that Hutchinson had either deposited them into other business accounts or had lent them to other business ventures. Gomez had no access to these funds or to the accounts into which the funds were deposited, and she was not involved in the finances of Hutchinson's businesses. She had

---

[2] The parties later moved to New York for a time.

her own banking accounts, credit cards, business ventures, and real estate that were separate property.

[¶6]  The couple separated in 2020, and Hutchinson filed his complaint for divorce on August 4, 2021.  The parties then engaged in protracted motion practice.

[¶7] On June 6, 2023, the court held a hearing on interim spousal support, the validity of the premarital agreement, and Gomez's request for discovery sanctions.  At the hearing, the court ordered Hutchinson to pay $10,500 of Gomez's attorney fees as a sanction for discovery violations.  The court also granted Hutchinson's motion to sever, from the final divorce hearing, the issues of whether the agreement was ambiguous and whether it applied to property acquired during the marriage.

[¶8]  On December 19, 2023, the court held a hearing on the premarital agreement.  The parties stipulated that (1) the premarital agreement was valid, although they disagreed on its scope and application; (2) Hutchinson had paid Gomez a lump sum of $36,500 as the spousal support payments required under the agreement; and (3) Hutchinson had a credit of $130,000 for other payments made to Gomez.  The court determined that (1) Gomez did not waive her right to seek attorney fees; (2) Gomez did waive any right to an increase in value of

Hutchinson's separate property; (3) Hutchinson was not required to purchase the condominium identified in the agreement because of the word "intends"; and (4) it had no jurisdiction over Gomez's claim for breach of the premarital agreement because neither party actually owned the condominium at issue. Gomez then filed a motion to alter or amend the judgment and a motion for further findings of fact, both of which the court denied on March 7, 2024.

[¶9] The court held a hearing on the remaining issues on October 2 and December 5, 2024. The court determined that the premarital agreement made each party's business interests, including those created or acquired subsequent to the marriage or that increased in value during the marriage, separate property. The court ordered Hutchinson to pay Gomez $125,000 to effectuate a just distribution of marital property, subject to credits for the payments Hutchinson had already made. The court also ordered Hutchinson to pay Gomez's attorney fees in the amount of $25,000.

[¶10] Gomez then moved for reconsideration of the judgment of divorce and for amended and additional findings of fact. The court granted in part and denied in part her motion for amended and additional findings of fact, adding that Gomez's income is $65,000 and that Hutchinson "met his burden of establishing that the business interests he acquired subsequent to marriage

were nonmarital property pursuant to the terms of the Premarital Agreement." The court denied Gomez's motion for reconsideration, finding that both parties had engaged in contentious motion practice, thus warranting the reduction in the award of Gomez's attorney fees, and concluding that Gomez had not brought forward any new information to warrant reconsideration on the issue of Hutchinson's business interests and the resulting distributions of those interests.

[¶11]  Gomez then filed a timely notice of appeal.  *See* 19-A M.R.S. § 104 (2025); M.R. App. P. 2B(c)(1).

## II.  DISCUSSION

[¶12]  "Premarital agreements are contracts," and we evaluate them "in accordance with standard rules of contract construction."  *Dow v. Billing*, 2020 ME 10, ¶ 13, 224 A.3d 244 (quoting *Est. of Barrows*, 2008 ME 62, ¶ 3, 945 A.2d 1217).  The standard of review we apply depends on whether the contract language is ambiguous, which we determine de novo.  *55 Oak St. LLC v. RDR Enters., Inc.*, 2022 ME 28, ¶ 15, 275 A.3d 316.  If a contract is ambiguous, we review the court's interpretation for clear error; if it is unambiguous, we review the contract language de novo.  *Id*.  Although each party argues that the

language is unambiguous, their interpretations differ. We conduct our own review to determine whether any ambiguity exists. *See id.*

[¶13] Language is considered ambiguous "if it is reasonably susceptible to different interpretations." *Scott v. Fall Line Condo. Ass'n*, 2019 ME 50, ¶ 6, 206 A.3d 307 (quotation marks omitted). "The fact that parties have different views of what an agreement means does not render it ambiguous." *Champagne v. Victory Homes, Inc.*, 2006 ME 58, ¶ 10, 897 A.2d 803. "The interpretation of an unambiguous writing must be determined from the plain meaning of the language used and from the four corners of the instrument without resort to extrinsic evidence." *Portland Valve, Inc. v. Rockwood Sys. Corp.*, 460 A.2d 1383, 1387 (Me. 1983).

[¶14] Contracts must be "construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how one clause is explained, modified, limited or controlled by the others." *Am. Prot. Ins. Co. v. Acadia Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989 (quotation marks omitted). We seek to give effect to the plain meaning of the words in the contract and avoid an interpretation that renders any particular provision meaningless. *Dow*, 2020 ME 10, ¶ 14, 224 A.3d 244. We also "will

8

not infer from a general contractual provision that the parties intended to waive a statutorily protected right unless the undertaking is explicitly stated." *Id*. ¶ 17 (quotation marks omitted). Any waiver must be "clear and unmistakable." *Id*. (emphasis and quotation marks omitted).

## A.    Waiver Provisions

[¶15]  Gomez argues that the court erred in finding that new businesses acquired by Hutchinson during the marriage and any increase in value of those businesses during the marriage were nonmarital because the waiver contained in the third paragraph of section seven[3] of the premarital agreement applies only to those future business interests described in that paragraph. Gomez also

---

[3] Section seven reads:

**Roby's Future Business Expectations:** At the present time, Roby owns or has an interest in several businesses including, but not limited to, Robyko LLC and Melby Oil & Gas. It is expected that Roby shall acquire other assets after the marriage, in furtherance of his business interests, of his mother's estate planning and in furtherance of other family interests and expectations. Roby, therefore, believes that his net worth and income shall increase by virtue of these expectations.

Roby expects that in furtherance of his business and family interests, he will manage and further develop real estate belonging to Lexington Gardens, LLC, and perhaps other real estate during the marriage. Roby expects that this will increase his net worth as well as his income.

Roby and his family intend to be involved in several other business ventures and interests in the future as partners, shareholders, and officers. It is Roby's expectation that he may be actively involved in these ventures and that these may become valuable assets and increase his net worth and his income. Such business interests subsequent to the date of the marriage are specifically designated as Roby's sole and separate property, including, but not limited to, any increase in the value of those business interests notwithstanding that the increase in value may be due, in whole or in part, to the efforts or financial contributions of either party during the marriage.

argues that her waiver of equitable distribution of property contained in section nine[4] of the agreement does not include a waiver of rights to new business interests created or acquired during the marriage.

[¶16]  Hutchinson points out that section seven contains the phrase "including but not limited to" when discussing which business interests the waiver applies to.  He argues that the definition of "property" found in section eighteen[5] of the agreement, coupled with the language found in section five,[6]

---

[4] Section nine reads:

> **Waiver of Equitable Distribution:** It is agreed and understood between the parties that Rosanna does hereby waive and relinquish whatever rights she may acquire to share in the assets of Roby as a result of their marriage, and Roby does hereby waive and relinquish whatever rights he may acquire to share in the assets of Rosanna as a result of their marriage.  Roby and Rosanna specifically waive and relinquish all of their respective rights to equitable distribution of such property under 19-A M.R.S.A. § 953.  It is specifically agreed between the parties that in the event of a divorce or annulment there shall be no equitable distribution of any assets held by Roby as his separate property and no equitable distribution of any businesses or business interests held by Roby.  Furthermore, it is specifically agreed between the parties that in the event of a divorce or annulment there shall be no equitable distribution of any assets held by Rosanna as her separate property and no equitable distribution of any businesses or business interests held by Rosanna, including, but not limited to, any increase in the value of those business interests acquired by Rosanna after the marriage notwithstanding that the increase in value may be due, in whole or in part, to the efforts, or financial contributions of either party during the marriage.

[5] Section eighteen reads:

> **Acquisitions:** Any reference herein to a party's property or estate shall include any property, real or personal, of whatever kind or wherever situated, which such party now owns, possesses or is entitled to or which he or she may own, possess or become entitled [to] hereafter.

[6] Section five reads:

demonstrates that Gomez clearly waived her right to any future interests in his businesses.

[¶17]   As usual, we begin with the language of the contract itself to determine the contract's meaning.  *See Scott*, 2019 ME 50, ¶ 9, 206 A.3d 307. Here, section seven discusses several different future interests of Hutchinson's in broad terms, including potential unnamed future interests, but the third paragraph contains the key phrase that "[s]uch business interests subsequent to the date of the marriage are specifically designated as Roby's sole and separate property, including, but not limited to, any increase in value of those business interests."   Gomez's argument that the waiver applies only to the businesses described in the third paragraph is unavailing, as such a reading would make the first two paragraphs of section seven meaningless, which is an interpretation we seek to avoid.  *See Dow*, 2020 ME 10, ¶ 14, 224 A.3d 244.

---

**Property to Remain Roby's:** Rosanna shall not, by reason of the parties' marriage and continued marriage, acquire any interest, right or claim in or to the separate property and estate of Roby.

Rosanna hereby acknowledges and agrees that all of Roby's property and estate is and shall remain and be his separate property, subject to his individual control, use and disposition as if he were unmarried, without claim or interference by Rosanna, except as set forth in paragraph 14.  On this date said property and estate of Roby is itemized in Exhibit "B".   Rosanna will execute any deed or other instrument reasonably necessary for conveying, mortgaging or creating or transferring any interest in such property or otherwise fully and effectually carrying out the intent and purpose of this Agreement.

[¶18]   In addition, section nine of the agreement contains an explicit waiver of equitable distribution and any rights under 19-A M.R.S. § 953, which would include any business interests or increases in value of the property acquired after marriage. *See Blanchard v. Blanchard*, 2016 ME 140, ¶ 22, 148 A.3d 277 ("Here, the premarital agreement unambiguously states that it was executed in full release of any and all marital rights; thus, all statutory rights were released.").   Gomez argues that because there is no specific mention of property acquired after the marriage within the waiver, there is no waiver of her right to equitable distribution of the businesses, but section nine specifically states that Gomez waived her rights to any assets "as a result of the marriage" that she may have had a right to.   *See* 19-A M.R.S. § 953(3). Additionally, section nine plainly states that there "shall be no . . . equitable distribution of any businesses or business interests held by" Hutchinson.

[¶19]  Looking at the agreement as a whole, it clearly reflects that Gomez relinquished any claim to rights arising by virtue of marriage to all of Hutchinson's business and financial assets.[7]   Given the unambiguous and all-encompassing language of the premarital agreement on this issue, we discern no error or abuse of discretion in the trial court's analysis of the terms

---

[7] We note that the agreement provides an equivalent waiver by Hutchinson of property owned or acquired after the date of the marriage by Gomez.

of the agreement relating to Hutchinson's businesses and financial affairs and Gomez's waiver of any claim to present or future assets that might otherwise be deemed to be marital property.

## B.    The Condominium Provision

[¶20]  Gomez contends that the trial court erred in determining that the premarital agreement did not require Hutchinson to purchase the condominium because section fourteen of the agreement states that Hutchinson "*intends* to purchase a condominium located at 403 Chandler's Wharf, Portland."[8]  (Emphasis added.)  She also maintains that the court erred

---

[8]  Section fourteen reads:

> **Marital Residence:** The parties currently do not own a Marital Residence at this time. Roby intends to purchase a condominium located at 403 Chandler's Wharf, Portland, Maine 04101 outright from his mother or her representative within the next several years (the purchase is expected in 2016).  The parties currently live in this condominium.  Roby will purchase the condominium with his own funds sometime around 2016.  It is the intention of the parties to reside in this condominium after they are married as their marital residence.  With respect to such marital residence, it shall be titled from the date of purchase in the parties' joint names as joint tenants.

> Upon the occurrence of the termination of the marriage by divorce, annulment, legal separate, or any other termination of their marriage other than the death of one or both of the parties, the net value of the marital residence (defined as the fair market value, less any first mortgage and other liens or encumbrances thereon) shall be divided equally between the parties, and Roby shall pay to Rosanna her one-half share thereof within sixty days of the termination event.  The parties further agree that neither party shall encumber the primary residence with any second mortgage, home equity line of credit, or any other encumbrances without the express written consent of the other party.  Upon Rosanna's receipt of the payment due to her under the terms of this paragraph, she shall cooperate in executing all documents required to transfer title to the primary residence to Roby.

in determining that it did not have jurisdiction over her claim for breach of contract because the claim is for a contractual right, which is property, and the court has jurisdiction pursuant to 19-A M.R.S. § 953 to resolve property disputes in a divorce action.

[¶21]  We review a court's determination of subject matter jurisdiction de novo.  *Gutierrez v. Gutierrez*, 2007 ME 59, ¶ 13, 921 A.2d 153.  "The jurisdiction of the divorce court is purely statutory, and its authority to act on matters of divorce must arise out of the statutory law or not at all." *Dobbins v. Dobbins*, 2020 ME 73, ¶ 12, 234 A.3d 223 (alteration and quotation marks omitted).  "In a divorce proceeding, the District Court has subject matter jurisdiction to determine the ownership interests of the spouses in order to divide their marital property."  *Howard v. Howard*, 2010 ME 83, ¶ 11, 2 A.3d 318.

[¶22]  Although the court correctly concluded that the Chandler's Wharf condominium could not be set apart or awarded to either party because neither party owns it, it erred in its concomitant conclusion that the divorce court has no authority to award damages or other remedies for a party's breach of a term of a premarital agreement.[9]  *See Stotler v. Wood*, 687 A.2d 636, 638 (Me. 1996)

---

[9]  The court expressly denied Gomez's claim for damages based upon a textual interpretation of the word "intends" finding, as a matter of law, that it was inadequate to create a binding commitment

("[A]ll personal property, tangible and intangible, in which a spouse acquires an interest is includable as property to be divided by the court. *Choses in action, rights and other interests, the benefits of which may be receivable now or in the future* are classifiable as intangible personal property." (emphasis added) (alteration and quotation marks omitted)); *Zeolla v. Zeolla*, 2006 ME 118, ¶ 7, 908 A.2d 629 ("We have interpreted section 953 as granting broad discretion to the divorce court to achieve an equitable distribution of marital property in every case."); *Wellington v. Rugg*, 136 N.E. 831, 833 (Mass. 1922) (stating that a breach of a premarital agreement entitles the nonbreaching party to bring a claim for breach of contract), *overruled on other grounds by Rosenberg v. Lipnick*, 389 N.E.2d 385, 388-89 (Mass. 1979).

[¶23]  Independent of its jurisdictional determination, the court concluded that in any event Hutchinson's failure to purchase the condominium did not constitute a violation of the premarital agreement; in doing so, the court emphasized that the first sentence of section fourteen provided only that

---

for future action.  The court characterized its denial of the claim as being without prejudice to a separate action for breach of contract.

A separate civil action is appropriate where a party to a divorce has a property interest in which a third party also claims an interest.  In that instance, a separate action to determine rights in the property is necessary.  *See Littell v. Bridges*, 2023 ME 29, ¶¶ 10-17, 293 A.3d 445; *King v. King*, 2013 ME 56, ¶ 21, 66 A.3d 593.  Here, however, no separate civil action is required because neither party owns a share of the condominium in common with a third party.

Hutchinson "intends" to purchase the condominium. Although section fourteen of the agreement, entitled "Marital Residence," is a stand-alone provision, it is part and parcel of a larger contract, and must be read in the context of the other provisions to discern the intentions of the parties. *See Am. Prot. Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989.

[¶24] Section five of the agreement is instructive on this point: "Rosanna hereby acknowledges and agrees that all of Roby's property and estate is and shall remain and be his separate property, subject to his individual control, use and disposition as if he were unmarried, without claim or interference by Rosanna, *except as set forth in paragraph 14*." (Emphasis added.) As section five illustrates, Gomez's only consideration for forfeiting any claim to what might otherwise be deemed marital property was the anticipated marital home—the Chandler's Wharf Condominium—which would provide her with a measure of financial security in the event of divorce. While the trial court focused its analysis of section fourteen on the plain language meaning of "intends," the remainder of the language in section fourteen, as well as the highly detailed plans for distributing the value of the residence, offer additional insight into the parties' intent and expectation that the acquisition would occur.

[¶25] The court's singling out of the word "intends" cannot alone provide a basis for its conclusion that the premarital agreement did not require Hutchinson to purchase the condominium, because the analysis of the agreement must include a review of the entire document as a whole to discern the parties' intentions. *See Am. Prot. Ins. Co.*, 2003 ME 6, ¶ 11, 814 A.2d 989. Here, after reciting that Hutchinson "intends" to purchase the condominium, section fourteen thereafter describes the purchase using the mandatory words "will" and "shall." Section fourteen provides when the purchase is expected to occur (2016), the funds to be used ("Roby will purchase the condominium with his own funds"), that the condominium will be the parties' marital residence, and that it will be held as joint tenants.

[¶26] When read in context with the other provisions of the agreement, section fourteen unambiguously provides that Hutchinson was to purchase a specific condominium owned by his mother; that in the event of divorce the value of the condominium would be split equally between the parties; and that this was consideration for Gomez's waiver of certain future claims of a marital interest in Hutchinson's significant assets. The record clearly establishes that Hutchinson failed to comply with the contractual terms of the agreement. The court must consider Hutchinson's failure to purchase the condominium and

what, if any, relief is appropriate in the larger context of the division of property.

[¶27] Although there is no condominium in the marital estate subject to division, the premarital agreement contemplates that Gomez would receive half of the value of the condominium in the event of divorce. The court has jurisdiction to make the award as part of the equitable division in this matter. *See* 19-A M.R.S. §§ 103, 601-11 (2025); *see also Gade v. Gade*, --- A.3d ---, 2025 WL 3730948, at *3 (Vt. 2025). Accordingly, we vacate that portion of the judgment in which the court concluded, based upon a plain-language interpretation, that Gomez was preemptively precluded from any remedy available under section fourteen. We remand for further proceedings for the trial court to determine what, if any, equitable distribution is appropriate given Hutchinson's failure to purchase the condominium as anticipated by the terms of the agreement.

## C. Attorney Fees

[¶28] Gomez contends that the court abused its discretion when it awarded her attorney fees in the amount of $25,000 instead of her requested amount of $100,486.10.

[¶29]  We review an award of attorney fees for an abuse of discretion. *Efstathiou v. The Aspinquid, Inc.*, 2008 ME 145, ¶ 66, 956 A.2d 110.  A court "may award fees based on the parties' relative abilities to pay and the award's fairness given the totality of the circumstances."  *Id.*; *see also* 19-A M.R.S. § 105(1) (2025).  "A party's conduct may be taken into account in awarding attorney fees especially when costs of litigation, or other expenses related to the divorce, have been needlessly increased."  *Urquhart v. Urquhart*, 2004 ME 103, ¶ 6, 854 A.2d 193.

[¶30]  The record reflects that the court correctly considered the factors justifying an award of attorney fees as well as the considerations regarding the amount of fees, noting that the award was made considering Hutchinson's ability to absorb the costs of the litigation, the value of the nonmarital assets set aside to him, and Gomez's repeated challenges to the premarital agreement.[10] *See Neri v. Heilig*, 2017 ME 146, ¶ 16, 166 A.3d 1020.  Although we discern no error or abuse of discretion, the court, on remand, retains the jurisdiction and discretion to revisit the attorney-fee award.

---

[10]  We note also that the court correctly concluded that attorney fees in this proceeding are not governed by the terms of the agreement.

The entry is:

> Judgment vacated. Remanded to the District Court for further proceedings consistent with this opinion.

---

Michael J. Donlan, Esq., and Jonathan M. Dunitz, Esq. (orally), Verrill Dana, LLP, Portland, for appellant Rosanna Paola Cordoba Gomez

Michael E. Saucier, Esq. (orally), Libby O'Brien Kingsley & Champion, Kennebunk, for appellee Robert J. Hutchinson

Portland District Court docket number FM-2021-531
FOR CLERK REFERENCE ONLY